## MOIR & NORTON *vs.* BROWN.

S. & F. made an assignment, for the benefit of creditors, giving preferences according to schedule B, of "all and singular the lands, tenements, &c., situate within the state of New-York, and all the goods, chattels, &c., and property of every name and nature of the said S. & F., more particularly enumerated and described in the schedule hereto annexed marked ' schedule A,' in trust that the assignees should take possession and sell and dispose of the same; upon such terms and conditions as in their judgment they may think meet," &c., "and convert the same into money." The assignment consisted of separate sheets, not attached together when it was executed. S. himself drew schedule A, which was on a separate sheet; and there was no evidence that F. ever saw it. Afterwards the several sheets, excepting schedule A, were wafered together, and sent to the clerk's office to be recorded; the attorney who drew the papers still retaining schedule A. After the making of a contract for the sale of the assigned property, by the assignees, and a levy thereon by a creditor, and the commencement of a suit by the purchasers, against the sheriff, schedule A was attached to the assignment. *Held*, that the schedule, containing a specification of the property conveyed, would have controlled and limited the general words of the assignment; that such schedule not being annexed, the assignment was insensible, and, as against creditors, did not convey the property to the assignees.

*Held also*, that parol evidence in relation to the schedule not annexed, was inadmissible to explain, vary or affect the sealed instrument; though such instrument was imperfect without it.

One named as trustee, in a deed, may renounce, or refuse to accept, and the willing trustees take the estate. But *it seems* that without disclaimer, neglect, refusal, or notice, the other trustees named cannot proceed, in such a case, and execute the trust.

Whether an assignment of his property, by a debtor, which authorizes the assignees to sell upon credit, is not void as against creditors? *Quære.*

THE complaint in this cause alledged that the plaintiffs, in September, 1850, were copartners, and as such, owners of a quantity of merchandise specified, of the value of $3000, which the defendant, being sheriff of Warren county, wrongfully seized and carried away out of their possession, and they prayed a return and damages. The answer denied the copartnership and the ownership and possession of the plaintiffs; admitted the defendant was sheriff, but denied that he took the property without authority, &c.; but set up a judgment in favor of one Lathrop and another, against Shattuck & Foster, for over $400, render-

ed September 11, 1850, and execution issued thereon to the defendant, by virtue of which he levied upon a certain portion of the property in question, which he specified, and upon that only, and that the same was the property and in possession of Shattuck & Foster. The reply denied there was any such judgment or execution or levy upon the part specified by the defendant; but alledged, on the contrary, that without lawful right or authority, he took and carried away all of it. It denied the goods were in the store of Shattuck & Foster at the time of the levy, or were their property, or the property of any one but the plaintiffs, or liable to be taken by virtue of an execution against Shattuck & Foster, or that they were in the possession or control of the latter. The cause was tried before Mr. Justice Cady at the Warren circuit, in May, 1851, and a verdict found for the plaintiffs, upon which judgment was rendered. A bill of exceptions was signed, and the defendant appealed. On the trial, the plaintiffs, to show property, gave in evidence an instrument under seal, dated July 16, 1850, executed by Shattuck & Foster, reciting that S. & F. were indebted and unable to pay, and were desirous to make a fair distribution, &c.; and in consideration of the premises and one dollar, they granted, bargained, sold, released, assigned and set over to Amasa Shattuck of Massachusetts, and Royal Ball of Troy, their heirs and assigns forever, "all and singular the lands, tenements and hereditaments, situate, lying and being within the state of New-York, and all the goods, chattels, merchandise, bills, bonds, notes, book accounts, claims, demands, choses in action, books of account, judgments, evidences of debt, and property of every name and nature whatever, of the said parties of the first part, more particularly enumerated and described in the schedule hereto annexed marked schedule A, to have and to hold the same, and every part and parcel thereof, with the appurtenances," in trust, "to take possession of all and singular the lands, tenements and hereditaments, property and effects hereby assigned, and sell and dispose of the same upon such terms and conditions as in their judgment they may think best and meet for the interest of the parties concerned, and convert the same into money," and pay

the expenses, and then certain preferred creditors, and with the surplus to pay all the creditors of S. & F., returning the surplus, if any, to the assignors. And for the better execution of the trust, the assignees, their administrators, executors and assigns, were appointed the true and lawful attorneys, irrevocable, of the assignors, with power to do all that was necessary in the premises. It was acknowledged on the 19th of the same month, before a justice. Schedule B was on the third half sheet, and read as follows : " Schedule B. Being the individuals or firms to be first paid out of the proceeds of the assignment made this 16th day of July, A. D. 1850, by Benjamin T. Shattuck and Edward C. H. Foster, to Amasa Shattuck and Royal Ball, and stating the names of five creditors. On the fourth half sheet was the provision in relation to the surplus, and the rest of the assignment.

Marcus Ball testified that he was a subscribing witness to the assignment. That the assignor, Shattuck, executed it in Troy, at the office of the witness, on the 16th of July, 1850, and Foster, at their store in Glen's Falls, where the assignors resided, and were merchants, on the 19th. That he went up to Glen's Falls to have Foster execute it, and to take possession. That the sheets were not wafered together when he came to G.; nor could he state that they were at any time. That he did not detach any schedule A from it before he sent it for record. That schedule A was in B. F. Shattuck's handwriting. That it was made out when S. signed the assignment, and had been in witness' possession ever since. That he attached schedule A to the assignment after he received the latter back from the clerk's office, but he could not state when. That he kept schedule A in his possession when the rest of the assignment was sent for record, and it was never attached until after the assignment was recorded. That he was attorney for the plaintiffs, and brother of one of the assignees, who was a preferred creditor. That the schedule A was present in his office when S. executed the assignment. That it was then all present, but in separate sheets. Under objection, the witness testified, that all the sheets were presented to Shattuck or declared by him as parts of the assign-

ment. The witness further testified, under objection, that the assignees acted under the assignment; sold some of the goods, and collected money. That he did not see Amasa Shattuck making any collections. The plaintiffs then offered the assignment in evidence; to which the defendant objected that it was never executed; that it was never properly executed; that it had not been properly proved; that it conveyed nothing, and was void inasmuch as it authorized the assignees to sell on credit. These objections were overruled, and the defendant excepted, and the assignment was given in evidence. The witness further testified, that when Foster executed the assignment, the witness took possession of the store. That he went about it, saw what was there, took the key and closed it about 6 P. M.; kept the key till next morning, and then left for Troy, leaving the key with Shattuck & Foster and the store in their charge. That he left the books of account and carried away nothing. That he could not say whether he left the assignment with them to be sent to be recorded, or sent it himself. That he was not at G. again till the next September, when these suits were commenced, and in the intermediate time S. & F. retailed the goods. That the plaintiffs lived in Ohio.

H. Van Tassel testified, that he took the acknowledgment of both assignors on the 19th July, and that Foster executed it in his presence. The assignment, not including the schedule A, had a certificate on the back that it was recorded on the 22d July, 1850, in the book of deeds, by the clerk of Warren county.

Royal Ball swore, that at the date of the assignment S. & F. owed him over $1080 for cash and indorsements, loaned. That he left Troy on the 17th of July for Ohio, and was gone four weeks, and while absent he negotiated a sale of the assigned property to the plaintiffs, who were about to commence business in Bristolville, O. That soon after his return Moir called on him, and the witness named a sum for which he could have the entire stock of goods. That Moir went to Glen's Falls to look at the goods, and after a day or two concluded to take them. That witness then ordered S. & F. to ascertain the stock and box them up. Moir bought some of the store fixtures, individ-

Moir *v.* Brown.

ually, at $104,49. The balance he took for his firm. The goods were sold 25 per cent lower than the original cost in Troy and New-York, and were a broken remnant. Goods to the amount of $295 had been sold in the store after the assignment, deducting which, and the 25 per cent, and $104 sold to Moir, left a balance sold to the plaintiffs of $2514,49, which was the fair value, and the goods were taken possession of at the time, and paid for, all but $150, on the 18th of September, 1850.

Amasa Shattuck testified, he was the brother of B. F. Shattuck, who was indebted to him, in July, a little short of $1800 for money he had lent him. That he could not tell when, nor from whom, he first heard of the assignment. That he conversed with his son about it before it was made. The defendant objected to evidence of these conversations, but they were admitted. He further testified that he had not heard of the sale until after it was made. That his acting as the assignee was talked of in May. That he had information that he was appointed assignee, but he could not tell by whom, whether by his son or by Ball. He did not know as he had done any thing under the assignment, before he came to Troy in September, and that he was seventy-two years of age.

Foster, one of the assignees, testified that he and Shattuck were employed in the store after the assignment, one for $20 the other for $25 per month. He also testified, under objection, that he and B. F. Shattuck had no real estate out of New-York, nor any personal estate except what was in the schedule A.

It was proved that the assignees sold and delivered the goods to the plaintiff on the 18th of September, 1850, and received in payment four notes of $626,12 each, at 4, 8, 12 and 16 months. The defendant proved the judgment set up in the answer entered on the 11th of September, 1850, and execution issued thereon on the same day; and the deputy who received it, testified that he levied on the same day on a part of the goods, which he specified.

The proof being closed, the defendant moved for a nonsuit, because the proof did not show the assignment was properly executed to transfer the title; nor show that schedule A was

present when Foster executed the assignment; nor that the assignment was executed by S. & F.; nor that Amasa Shattuck ever accepted or acted under the assignment, or authorized his name to be used in the instrument. But that the proof did show the plaintiffs were not bona fide purchasers. That the assignment was void because it conveyed nothing; and also because it allowed the assignees to sell on credit. The motion for a nonsuit was denied, and the defendants excepted, and the jury found a verdict for the plaintiffs for six cents damages, and assessed the value of the property at $2300.

*E. H. Rosekrans*, for the appellant.

*W. A. Beach*, for the respondent.

*By the Court*, HAND, J. It does not appear that one of the subscribing witnesses saw the assignment executed at all; and the other only wrote the initials of his name, on the 16th or 19th of July. But it is sufficient that Shattuck & Foster both acknowledged the assignment before a proper officer.

It is pretty clear from the testimony, that the assignment was not delivered to Amasa Shattuck, nor did he accept the trust, or act under it, until after the levy. R. Ball testified, that he acted under an authority from Shattuck, in writing; but, though called for on the trial, no writing was produced, and the testimony of Amasa Shattuck himself certainly tends to show that he did not accept the trust, at least till after the levy; and leaves it in doubt whether he ever heard of it, until about the time he came to Troy, in September, after the goods were sold. He says he consented to act as assignee with reluctance. But his son wrote to him in September, to come to Troy, and he adds, "I think I knew before that time that the assignment had been made; I do not know when or how I got the information." He states, that before the goods were sold to the plaintiffs, "he had heard nothing in regard to the purpose of selling." Delivery of a deed to a third person, is said to be a good delivery, if it be for the use of the grantee. (*Church* v. *Gilman*, 15 *Wend.* 656.

*Elsey* v. *Metcalf,* 1 *Denio,* 323. *Rathbun* v. *Rathbun,* 1 *Barb. S. C. Rep.* 98.) And a part of the trustees named may, it seems, renounce, and the willing trustees take the estate. (*Small* v. *Marwood,* 9 *B. & C.* 300. *Nicholson* v. *Woodworth,* 2 *Swanst,* 365. 21 *Vin.* 535. *Hill on Trustees,* 225. And see *Johnson* v. *Fleet,* 14 *Wend.* 176 ; *Crewe* v. *Dicken,* 4 *Ves.* 97 ; *Adams* v. *Taunton,* 5 *Madd.* 435.) But I find no case authorizing one assignee to execute the trust without any disclaimer or neglect of his co-assignee, and without even notice to him of the assignment. One named as trustee may refuse to accept, in which case the estate never vests in him. (*Townson* v. *Tickell,* 3 *Barn. & Ald.* 31. *Hill on Trust.* 223.) And it seems he may disclaim by parol ; and even his conduct may amount to a disclaimer. (*Hill on Trus.* 224.) But to disregard him in the first instance, without notice and without any neglect or expression of refusal on his part, would be disregarding an important part of the assignment. As to realty, trustees take as joint tenants, and all must unite in a sale, and they have all equal power, interest and authority, with respect to the trust estate. (1 *R. S.* 727, § 44. *Id.* 735, § 112. *Hill on Trust.* 305, *and cases there cited.*) As between the parties thereto, it is generally presumed the grantee accepts a conveyance, until the contrary is proved. (*Townson* v. *Tickell, supra. And see Doe* v. *Smith,* 6 *B. & C.* 112 ; *Hill on Trust.* 224.) But it has been held that an assignee must accept before levy upon personal property. (*Crosby* v. *Hillyer,* 24 *Wend.* 280.)

If any estate vested in Shattuck before the levy, he seems to have had no agency in the attempted sale. It would have been difficult to make him accountable as trustee, upon the ground of any interference with the trust fund, up to the time of the sale.

The complaint alledges that the defendant, as sheriff of the county of Warren, "without any lawful right or authority, unjustly seized, and forcibly and wrongfully took from the possession of the plaintiffs, and without any lawful right or authority carried away" the property. The sale to the plaintiffs was on the 18th of September. The deputy of the defendant testified that he made the levy on the 11th of that month. If the taking

was at that time, the property was not taken from the possession of the plaintiffs, and they could not maintain this action. I do not, however, find that this objection was specifically taken at the trial.

But disregarding these objections, I think there is a conclusive answer to this suit. When Shattuck executed the assignment, the schedule of the property was present, though not annexed to the assignment. As I understand the testimony, the assignment and schedules were then on several loose sheets or half sheets, not fastened together in any way; and he declared these sheets parts of the same instrument. Three days afterwards Foster signed the assignment, and after that, it would seem, all but schedule A were wafered together by some one, and transmitted to the clerk of the county, in an adjoining town, for record. A person acting for one of the assignees kept possession of schedule A, and after this suit was commenced, he obtained possession of the assignment, which had been recorded in the mean time, and then, for the first time, affixed schedule A thereto. It does not appear that the assignor, Foster, ever saw that schedule. It is said, the assignment conveyed all the personal property of Shattuck & Foster without the schedules. That conveys all their lands, tenements and hereditaments in the state of New-York, and adds, "and all the goods, chattels, merchandise, bills, bonds, notes, books of account, judgments, evidences of debt and property, of every name and nature whatever, of the said parties of the first part, more particularly enumerated and described in the schedule hereto annexed, and marked schedule A." Clearly this schedule contained the personal estate, and the only personal estate transferred. It would control and limit the general words, by every sound rule of construction. ( *Wilkes* v. *Ferris,* 5 *John.* 335. *Munro* v. *Alaire,* 2 *Caines,* 327. *Roe* v. *Vernon,* 5 *East,* 51. *Doe.* v. *Greathead,* 8 *Id.* 91.) And until that was annexed, the instrument would be inoperative. It conveys all the real estate in this state. But to the schedule we are to look for a specification of the personal property ; and the assignors may say, nothing more was conveyed ; only that which was thus "more particularly

enumerated and described." This assignment is almost in the very language of that in *Wilkes* v. *Ferris*, (*supra ;*) and the court said in that case, that it was not à general assignment, for although the words in one place be general, yet the assignment immediately goes on to specify, by a reference to schedules annexed, the specific articles of property assigned, and it therefore could operate only upon the articles specified. And had this been a perfect instrument as to B. F. Shattuck, still one partner could not make a general assignment to trustees for the benefit of creditors, giving preferences. (*Havens* v. *Hussey*, 5 *Paige*, 30.)

Even as between the parties, it seems an assignment would not be valid, unless executed with the schedules annexed. In *Weeks* v. *Maillardet*, (14 *East*, 568,) there was an agreement to deliver up to the plaintiff, on a future day, the whole of the mechanical pieces as per schedule annexed, so much to be paid therefor on the day that the plaintiff delivered the pieces as therein mentioned. Both parties executed both parts or duplicates of the agreement under seal; and the subscribing witness had present at the time an exact inventory of the property, and on which they had agreed, and which he afterwards copied upon the part or executed copy belonging to each. But the court held the contract insensible; and that it had no object to operate upon, without the schedule. From the report of the case, it seems that the judges did not put their decision merely on the nonexistence of the schedule at the time, or rather part of them did not advert to that circumstance; but on the ground that it was not, as it purported to be, a scheduled instrument. And in that case, as here, the instrument purported to convey the whole of his mechanical pieces. (*And see Burgh* v. *Preston*, 8 *T. R.* 486; *Brake* v. *Smith, Moor*, 679; *Zouch* v. *Clay*, 3 *Lev.* 35.)

There are some other decisions which sustain this view of the case. In *Averill* v. *Loucks*, (6 *Barb.* 474,) which was a contest among creditors, it was held that the assignments were void, where all the property was assigned to pay debts in certain schedules "annexed," and schedules giving preferences were to be made and annexed as soon as praticable, and within

sixty days in one, and thirty in the other; and one of them provided that a schedule of the personal property should be added within thirty days. What is not attached to the instrument, in such cases, is no part of it; and if afterwards attached by consent of all parties, it forms a new deed. (*Cook* v. *Remington*, 6 *Mod.* 237.) If another instrument is referred to, and so described as to make clear the identity, it becomes incorporated by the reference. (*Habergham* v. *Vincent*, 3 *Ves. Jun.* 228. *Tonnele* v. *Hall*, 4 *Comst.* 143.) And so where the instrument was an absolute conveyance, and the annexation of the schedule not a condition precedent, although it was provided that schedules should be made and annexed at some future time, it was held to be valid. (*Keyes* v. *Brush*, 2 *Paige*, 311.) And sometimes a subsequent misdescription does not vitiate. (*Mann* v. *Mann*, 14 *John.* 1. *Doe* v. *Greathead*, *supra.*) But the case is different where the schedule is made a part of the conveyance, and is referred to as containing a specification of property conveyed, and was intended to be annexed. It must then be annexed, not only as a description and specification of the property, but it is necessary by the very terms of the instrument, to complete the conveyance or transfer.

Affixing the schedule after the suit was commenced did not remove the difficulty. If it had been duly authorized by the parties to it and re-delivered, it might have been a valid assignment of the personalty, as between the parties, from that date. But if done by the assignees only, or by one authorized to act for them, it was a material alteration, and would make the assigment, at least, void for the purposes of evidence. (*Pigot's case*, 12 *Coke*, 27. *Chitty on Cont.* 677, 591. *Lewis* v. *Payne*, 8 *Cowen*, 71. *Waring* v. *Smyth*, 2 *Barb. Ch.* 119.) But I find no proof that it ever was annexed by the authority of the parties, or with their knowledge.

No doubt a contract may consist of different papers, as letters, statements, &c., but as a general rule, they must all refer to each other, so as to be understood without parol evidence. Wills of personal estate, in England, were almost exceptions before the last revision, for they were often made in the loosest

manner, and yet sustained by the ecclesiastical courts. But those decisions do not affect the general rule. The recent case of *Dyer* v. *Green*, may seem in conflict with these views. (1 *Exch. Rep.* 71.) The plaintiff claimed under a bill of sale of "all the goods, fixtures, household effects, plate, china, and effects of whatever nature or kind belonging to us, and in and about the messuage, tenements or premises where he now resides, and being No. 2 Park Road, Old Kent Road in the county of Surrey, and the chief articles whereof are particularly enumerated and described in a certain schedule hereunto annexed." The schedule was not annexed or stamped. At the trial, the chief baron thought the schedule a separate instrument, requiring a stamp, and the assignment inoperative without it. But a new trial was granted; and Alderson, B. who delivered the opinion of the court, said, "the deed must be considered as enumerating all the articles : it in fact does so, by describing them as articles in a particular house." Whereas he considered the conveyance in *Weeks* v. *Maillardet* was of a certain number of uncertain articles ; and, as the party bound himself to deliver all the articles in the schedules, the deed was insensible without the schedules. *Dyer* v. *Green* was very dissimilar to the one now under consideration. The bill of sale, irrespective of the schedule, specified the kind of articles, and described them as being in a particular house, occupied by the vendee, and were therefore very probably in his possession, and the schedule did not purport to contain all the articles ; so that the bill of sale was the best evidence of what was sold; and would not have been controlled, limited or restricted by the schedule, if it had been admitted. It is difficult to see how it could have varied the effect of the bill of sale in any way. The judge said, in relation to *Weeks* v. *Maillardet*, "in that case, all the articles were enumerated in the schedule—here they are not—which shows that the deed has an operation independently of the schedule." And the chief baron said it had before been decided, (*Duck* v. *Braddyle*, *M'Clel.* 217,) that a deed legally stamped was not vitiated by referring to inventories not stamped; and that the question was, does the deed operate without the inventory ;

if it does, then the inventory is merely referred to as a memorandum for a more certain knowledge of the articles. But the case now under consideration resembles that of *Weeks* v. *Maillardet.* The schedule, had it been annexed, would have been valid, and would have controlled the assignment, making it an assignment of certain specified articles. That was what all parties intended to do, but left the instrument inchoate and imperfect in a most material part. The assignment proposed by the parties was never executed. How was it possible for the assignees, even as between them and the assignors, to show title to a single article? The schedule was, until annexed, no part of the deed, and could not be proved to explain, vary or affect the sealed instrument. All the cases in which this has been allowed, were by a memorandum made on the deed before or at the time of its execution; or by some plain reference to another separate instrument. Here the reference is to a schedule annexed, and there was none. This was the portion of the deed necessary to give force and effect to the conveyance; and without which it was impossible to know what was transferred. It will open the door for the grossest frauds, particularly as against other creditors, if the schedule may be kept separate and unrecorded until litigation begins, and be annexed at the pleasure of the assignees or any third person. Indeeed, the chancellor, in *Keyes* v. *Brush,* (*supra,*) and the court in *Wilt* v. *Franklin,* (1 *Bin. Rep.* 517,) intimated that the want of schedules furnished a presumption of fraud, in a suit between assignees and other creditors.

Upon principle and authority, I do not see how, at least as against creditors, we can sustain this instrument as a valid transfer of the personal property now in question. (*See Cooper* v. *Smith,* 15 *East,* 103; 1 *Sug. V. and P. ch.* 3, § 3; *Jackson* v. *Titus,* 2 *John.* 430; *First B. Ch. &c.* v. *Bigelow,* 16 *Wend.* 28; *Winsor* v. *Pratt,* 2 *B. & B.* 650; *Kenworthy* v. *Scofield,* 2 *B. & C.* 945; *Smart* v. *Prujeau,* 6 *Ves.* 560.)

If this view is correct, it seems unnecessary to notice some of the other points supposed to arise in this case. It is said the assignment was void, because it authorized a sale of the prop-

Moir *v.* Brown.

erty on credit. (*Barney* v. *Griffin,* 2 *Comst.* 365. *Porter* v. *Williams,* 5 *How. Pr. R.* 441. *Meacham* v. *Stearns,* 9 *Paige,* 105.) It authorizes the assignees to take possession of the property and " sell and dispose of the same upon such terms and conditions as in their judgment they may think best and meet for the interest of the parties concerned, and convert the same into money." This language certainly gives a broad discretionary power ; sufficient, in an ordinary power of attorney, to sustain a sale on credit. If the assignment had been valid to transfer the property, an improper execution of the trust, afterwards, would not divest the title of the assignees. They had notice to put them upon the inquiry as to the nature of their vendors' title ; and consequently they knew or might have known that such a sale, at least without the consent of the *cestuis que trust,* was not a proper execution of the trust. Without reference to the validity of the assignment, I very much doubt whether, under all the circumstances of this sale, the plaintiffs obtained such title to the property as will enable them to maintain this action, (1 *R. S.* 730, §§ 65, 66. *Hill on Trust.* 342, 165. 3 *Sug. V. and P.* 176, *et seq.* 10 *Paige,* 282.) However, if the view that has been taken in regard to the validity of the assignment is correct, it is not necessary to decide these points.

I think the judgment should be reversed and a new trial granted.

Judgment reversed.

[FRANKLIN GENERAL TERM, July 5, 1852. *Willard, Hand, Cady* and *C. L. Allen,* Justices.]